```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

| | |
|---|---|
| JAMES JOHNSON | CIVIL ACTION |
| VERSUS | NO: 11-2773 c/w 12-1534 |
| | APPLIES TO 11-2773 |
| PPI TECHNOLOGY SERVICES, L.P., et al | SECTION: "J" (3) |

### ORDER & REASONS

Before the Court is Defendant PPI Technology Services, LP ("PPI")'s **Motion for Summary Judgment on the Contractual Defense and Indemnification Obligations of Global Oil Consulting, LLC (Rec. Doc. 319)**, Third Party Defendant Global Oil Consulting, LLC ("Global Oil") and Plaintiff James Johnson ("Johnson")'s opposition to the motion (Rec. Doc. 330), and PPI's reply memorandum (Rec. Doc. 347). PPI's motion was set for hearing on February 12, 2014, on the briefs. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that PPI's motion should be **DENIED** for the reasons set forth more fully below.

### FACTS AND PROCEDURAL HISTORY

This matter involves claims for maintenance and cure, unseaworthiness, and negligence brought under general maritime law and the Jones Act arising from an attack on the HIGH ISLAND VII, a jack up drilling rig ("the Rig") located about twelve miles off the

1

coast of Nigeria. According to Johnson's affidavit submitted in connection with this motion, he was working in the Middle East in early 2010 when he learned that John Arriagea ("Mr. Arriagea") was hiring drilling supervisors for PPI, a Texas-based entity. (Rec. Doc. 330-3, p. 1) After speaking with Mr. Arriagea and PPI's Vice President of Contract Administration, Galan Williams, Johnson alleges that he was offered employment as a drilling supervisor in Nigeria. (Rec. Doc. 330-3, p. 1) Johnson then worked with another PPI employee, Sandra Birkline ("Ms. Birkline"), regarding the details of his employment and his travel to Nigeria. Ms. Birkline provided Johnson with a Consulting Agreement that he was to sign. (Rec. Doc. 330-3, p. 1)  He signed the agreement, and it was sent to a Belizean entity, PSL, Ltd. ("PSL") to be countersigned. According to Johnson, it was his understanding that PSL was an international affiliate of PPI and that all contracts similar to his went through PSL for tax purposes. Johnson signed the Consulting Agreement on March 10, 2010 and PSL signed the agreement on March 11, 2010; however, the agreement was to take effect on March 25, 2010. (Rec. Doc. 319-5)

Also at sometime in early 2010, and allegedly upon a recommendation from his accountant, Johnson formed a limited liability corporation, Global Oil, for tax purposes. (Rec. Doc. 330-7, p. 6, ln. 24; p. 7 ln. 4) According to Johnson, Global Oil is essentially a "pass through entity," as he was the only member

of Global Oil and the only person who received funds from Global Oil. Following the creation of Global Oil, Johnson contacted Ms. Birkline to substitute Global Oil in his place in the Consulting Agreement. Ms. Birkline proceeded to send a Letter Agreement to Johnson that purported to make such an amendment. (Rec. Doc. 330-9, p. 11, ln. 9) The Letter Agreement was signed by Johnson as President of Global Oil on March 17, 2010 and by a representative of PSL on March 18, 2010. (Rec. Doc. 319-4)

Around April 17, 2010, Johnson traveled to Nigeria and began to provide services as a drilling supervisor aboard the Rig pursuant to the Consulting Agreement. Johnson's employment seemingly went forward without issue until November 7, 2010 when several Nigerian gunmen attacked the Rig. Johnson alleges that the gunmen boarded the Rig and led him at gunpoint to his room where they demanded money. Johnson further alleges that the gunmen then led him back to the Rig's galley where other crewmembers were gathered, shooting him in the leg along the way and causing serious injuries. In addition to his leg injuries, Johnson alleges that he continues to suffer from Post Traumatic Stress Disorder and has suffered great economic loss.

Johnson filed suit on November 8, 2011, naming as Defendants AFREN, PLC ("AFREN"), PPI, PSL, and Transocean, Ltd.. Following the filing of the original complaint, Johnson added GlobalSantaFe Offshore Services, Inc. as a Defendant. Johnson's case was

consolidated with another crewmember, Robert Croke ("Mr. Croke")'s, related case on June 20, 2012; however Mr. Croke's suit was recently dismissed by this Court on other grounds. See March 6, 2014 Order and Reasons, Record Document 364. PPI filed the instant motion for summary judgment on January 21, 2014.

## PARTIES' ARGUMENTS

PPI argues that, pursuant to the Consulting Agreement between PSL and Global Oil, Global Oil has a contractual duty to defend and indemnify PPI for Johnson's claims in this matter. In arriving at this conclusion, PPI asserts that general maritime applies when determining the validity of the Consulting Agreement and Letter Agreement, and that under such law, indemnity clauses similar to the one at issue in this matter are valid and enforceable. Even though the Consulting Agreement was initially signed by Johnson individually, PPI avers that it is binding on Global Oil under the terms of the Letter Agreement. Further, PPI argues that Global Oil has a duty to defend and indemnify PPI because PPI is either a subcontractor or affiliate of PSL. Finally, PPI points out that the indemnity provision expressly lists personal injury claims as falling under the provision, so Johnson's claims clearly trigger Global Oil's duty to defend and indemnify PPI.

Relying on Parks v. Dowell Div. of Dow Chemical Corp., 712 F.2d 154 (5th Cir. 1983), wherein the Fifth Circuit declined to enforce an "indemnity clause" which bound a seaman to release his

4

rights, Johnson and Global Oil contend that the Consulting Agreement violates public policy unless the indemnity clause was fully explained and additional consideration was given for the release of Johnson's rights. Johnson and Global Oil aver that, because the Consulting Agreement was signed after Johnson had been verbally hired by PPI, no additional consideration was given for the release. Further, Johnson and Global Oil contend that the Letter Agreement had no effect because one cannot amend a contract that is void. Alternatively, Johnson and Global Oil argue that Texas and/or Mississippi law apply to this matter, and the indemnity clause is invalid under those state laws. They further argue that, even if federal maritime law does apply, the indemnity provision would still be invalid because (1) it is more akin to a release and a seaman should not be allowed to contractually release his rights, and (2) Global Oil is merely a pass through company, so the Court should treat the contract as one between PSL and Johnson, not Global Oil. Finally, Global Oil and Johnson argue that even if the indemnity clause is upheld, it should not be applicable to acts of gross negligence.

    In its reply, PPI first points out that Johnson and Global Oil rely heavily on conversations between PPI employees and Johnson prior to the signing of the Consulting Agreement, and that such references should be disallowed based on the parol evidence rule. Further, PPI asserts that the Letter Agreement is valid and that

Global Oil is a valid party to the contract; therefore, the extra protections for seamen relied on in Parks do not apply in this matter. Finally, PPI argues that if any state law applies, it is Mississippi law, and the provision is valid under Mississippi law.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing F$_{ED}$. R. C$_{IV}$. P. 56(c)); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party."  Delta, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict

6

if the evidence went uncontroverted at trial.'" Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." Id. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. See Celotex, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See id. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. See, e.g., id. at 325; Little, 37 F.3d at 1075.

## **DISCUSSION**

Prior to determining whether the Consulting Agreement and Letter Agreement are valid and enforceable, the Court must determine which law applies to the agreements because the standard by which the agreements will be interpreted differ depending on the law applied.

## A. Choice of Law

Whether or not certain agreements "constitute a maritime contract depends, as does the characterization of any other contract, on the nature and character of the contract, rather than on its place of execution or performance." Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 316 (5th Cir. 1990)(internal citations omitted). Davis proscribes a two-part inquiry which looks to both "the historical treatment [of similar contracts] in the jurisprudence" and six factual questions, which ask:

    1) what does the specific work order in effect at the time of injury provide?

    2) what work did the crew assigned under the work order actually do?

    3) was the crew assigned to work aboard a vessel in navigable waters?

    4) to what extent did the work being done relate to the mission of that vessel?

    5) what was the principal work of the injured worker?

    6) what work was the injured worker actually doing at the time of injury?

Davis & Sons, Inc., 919 F.2d at 316. "A specialty services contract related to oil and gas exploration takes on a salty flavor when the performance of the contract is more than incidentally related to the execution of the vessel's mission." Energy XXI, GoM, LLC v. New Tech Eng'g, L.P., 787 F. Supp. 2d 590, 601 (S.D. Tex. Apr. 15, 2011) citing Domingue v. Ocean Drilling & Exploration Co., 923 F.2d

8

393, 396 (5th Cir. 1991).

### 1. Historical Treatment of Similar Contracts

The Court in Gilbert v. Offshore Prod. & Salvage, Inc., 95-122, 1997 WL 149959 (E.D. La. Mar. 21, 1997) aff'd, 134 F.3d 368 (5th Cir. 1997) found that general maritime law applied to a contract that provided for a "company man" to supervise and coordinate the work for which the vessel (a jack-up rig) had specifically been chartered. Gilbert, 1997 WL 149959 at *5. The court found that his supervision "enabled the vessel to perform the function for which it was designed," and went on to note that "[i]ndeed, as an on site supervisor for the tie-back and completion jobs, [the supervisor's] work required that he live and work aboard that special purpose vessel, required the use of a vessel and its crew, and was therefore inextricably intertwined with maritime activities." Id. (internal citations omitted). The Court in Energy XXI, GoM, LLC also applied general maritime law to a contract that provided for a "company man" where his "position was to supervise the recompletion operation," which operation "was an integral part of the primary purpose of a vessel." Energy CCI, GoM, LLC, 787 F.Supp.2d at 603.

### 2. Davis Factors

Looking to the six Davis factors, factors one and two may be collapsed to ask what work was to be done pursuant to the Consulting Agreement. The Consulting Agreement provided for Johnson

9

to work aboard the Rig to serve as a "well site supervisor." (Rec. Doc. 319-5, p.  He was assigned to a jack up drilling rig, which this Circuit has held is a vessel. Gilbert, 1997 WL 149959 at *5-*6. Regarding the third factor, the vessel was positioned in navigable waters. Further, regarding the fourth factor, the purpose of the vessel's mission was to drill, which is precisely the activity that Johnson oversaw. And, finally, Johnson was on the vessel when he was injured. Id. at *6.

Taking all of these factors and the jurisprudence into consideration, along with the fact that Johnson and Global Oil admit that the "underlying work contemplated [by the Consulting Agreement] was maritime in nature," the Court finds that general maritime law should apply to the Consulting Agreement and the Letter Agreement. (Rec. Doc. 330, p. 16)

**B. The Consulting Agreement**

The disputed indemnity provision states, in pertinent part, that:

> CONTRACTOR shall indemnify, defend and hold COMPANY, COMPANY'S CLIENT, COMPANY affiliated companies, their respective subContractors, and their respective officers, directors, shareholders, members and employees (collectively, "COMPANY GROUP"), harmless from and against all claims, demands, suits or causes of action for damage to or loss of any equipment or property of CONTRACTOR, its affiliated companies (if any), its subContractors, and their respective officers, directors, shareholders, members and employees (collectively, "CONTRACTOR GROUP") and for personal injury to or death of any member of CONTRACTOR GROUP regardless of whether such personal injury or death or loss or damage shall result in whole or in part from the negligence of COMPANY

> GROUP or the unseaworthiness of any vessel owned, chartered or operated by COMPANY GROUP. The indemnity obligation of CONTRACTOR hereunder shall also apply to liability of COMPANY GROUP resulting from the application of the doctrine of strict liability or statutory fault.

(Rec. Doc. 319-5, pps. 2-3). Global Oil and Johnson do not dispute that PPI falls within the definition of COMPANY GROUP, that Global Oil and/or Johnson fall under the definition of CONTRACTOR, or that Johnson's claims fall within this provision. Instead, Global Oil and Johnson more broadly argue that the entire provision is void and unenforceable; therefore, this is the only issue before the Court in the instant motion.

"The interpretation of a contractual indemnity provision is a question of law." Becker v. Tidewater, Inc., 586 F.3d 358, 369 (5th Cir. 2009). Under federal maritime law, indemnity clauses in maritime contracts are generally enforceable, even for a party's own negligence, as long as the indemnity provision is clear, express, and unambiguous. Pitre v. Custom Fab of Louisiana, LLC, 12-1074, 2013 WL 4499029, *5 (E.D. La. Aug. 20, 2013)(Milazzo, J.); McGrath v. Chesapeake Bay Diving, 620 F. Supp. 2d 747, 752 (E.D. La. 2009)(Barbier, J.); Despite this general rule, the Fifth Circuit found in Parks that an indemnity provision that obligated a seaman to indemnify himself for his own injuries was invalid where the defendants did not offer any proof that the plaintiff was compensated for the release of his rights or that the clause was explained to him. Parks, 712 F.2d at 160 (holding that it is

11

against public policy "to enforce agreements in which seamen have relinquished their protective rights absent a clear showing that the agreement is fair and fully compensated.")

The fundamental factual difference between Pitre, which is relied on by Defendants, and Parks, which is relied on by Johnson and Global Oil, lies in the identity of the obligor. In Pitre, the obligor was a limited liability corporation, Custom Fab of Louisiana, LLC ("Custom Fab"), which had entered into a contract with a corporation, Oceaneering International, Inc. ("Oceaneering"), wherein, using very similar language to that of the instant Consulting Agreement, Custom Fab agreed to indemnify Oceaneering for certain liabilities. Pitre, 2013 WL 4499029 at *5. In Pitre, the Court found that because general maritime law applied, the indemnity provision should be upheld. Id. at *5-*6. In Parks, on the other hand, the obligor of the contract at issue was an individual seaman who agreed to indemnify his employer and other related entities "for any and all claims, demands or suits arising out of the work to be performed under the contract." Parks, 712 F.2d at 159. Based on admiralty courts' tradition of protecting seamen, the Parks court refused to enforce the indemnity provision absent a showing that the defendants had (1) fully and fairly explained the indemnity provision to Parks, and (2) had provided additional compensation to Parks for the release of his rights. Id. at 160. PSL argues that, because the Consulting Agreement is

12

between Global Oil and PSL, Pitre should apply, and Johnson argues that, because he was the original signatory of the contract, Parks should apply.

### 1. Original Agreement Between Johnson and PSL

PSL's insistence on viewing the Consulting Agreement as a contract between Global Oil and PSL ignores the vital fact that Johnson, not Global Oil, originally signed the Consulting Agreement. Had Johnson never signed the Letter Agreement substituting Global Oil for Johnson in the Consulting Agreement, it is rather clear that Parks would apply because PSL attempted to contract away an individual seaman's rights by having him essentially release his claims against the company. Because there is no evidence that PSL fully explained this provision–and Johnson even alleges that PPI's representative incorrectly explained the effect of the Consulting Agreement[1]–the indemnity provision in the original Consulting Agreement violates public policy.[2] Therefore, the question becomes whether the Letter Agreement successfully amended the Consulting Agreement so as to make this an enforceable contract between two corporate entities under the reasoning in

---

[1] Though the Court agrees that Johnson's conversations with Ms. Birkline prior to the signing of the Consulting Agreement are parol evidence, such conversations are admissible in this context because they are not being relied on to contradict or explain the Consulting Agreement, but rather are being used to show that Defendants failed to properly explain the effect of the indemnity provision.

[2] As the Court has already found that the provision was inadequately explained to Johnson, it will not discuss whether Johnson was adequately compensated for his release.

Pitre.

### 2. Amendment to the Consulting Agreement/ the Letter Agreement Between PSL and Global Oil

Following Johnson's signing of the Consulting Agreement, but prior to the Agreement's effective date, Johnson notified PSL that he wished to amend the Consulting Agreement by substituting Global Oil, Johnson's newly formed limited liability company, in his place. Accordingly, PSL and Johnson, in his capacity as President of Global Oil, signed the Letter Agreement purporting to make this substitution. (Rec. Doc. 319-4) PPI contends that based on this amendment, the indemnity provision should be upheld. The Court disagrees.

"[A] contract against public policy [is void and] cannot be made valid by ratification." Theatre Time Clock, Inc. v. Stewart, 276 F. Supp. 593, 599 (E.D. La. Nov. 29, 1967); 17A C.J.S. Contracts § 252 ("An illegal agreement is void.") According to the Restatement (Second) of Contracts, a "promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor is often called a void contract," and "such a promise is not a contract at all."[3]  Restatement (Second)

---

[3] A void contract, such as a contract against public policy differs from a "voidable contract," which is a contract wherein "one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." Restatement (Second) of Contracts § 7 (1981) "[A] promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise, is binding [...] unless the promisor knew or had reason to know the essential facts of the previous transaction to which the promise relates." Restatement (Second) of Contracts §§ 85, 93 (1981).

14

of Contracts § 7 (Comment (a)) (1981); York Grp., Inc. v. Horizon Casket Grp., Inc., 06-0262, 2007 WL 2120419 (S.D. Tex. July 10, 2007) ("A 'void contract' is defined as a contract that is of no legal effect, so that there is really no contract in existence at all.")(internal citation omitted). Therefore, based on the finding that the indemnity provision in the Consulting Agreement between PSL and Johnson violated public policy, the Court must also find that the indemnity provision is void and it is as if the provision never existed at all. It logically follows then that the subsequent Letter Agreement, which purported to amend the Consulting Agreement by replacing Johnson with Global Oil is also without effect with regard to the indemnity provision because there was no provision to amend.

Though neither party expressly argues that the Letter Agreement created a whole new agreement, as opposed to simply amending the original agreement, by asking the Court to enforce the indemnity provision between Global Oil and PPI, PPI implicitly makes such an argument. The substitution of Global Oil for Johnson did not, however, create a new agreement because the novation of a contract cannot arise from an invalid contract. Novation occurs when there is a substitution in a contract "that has the effect of adding a party, either as obligor or obligee, who was not a party to the original duty." Restatement (Second) of Contracts § 280(a) (1981) A novation has the effect of extinguishing the original duty

15

and replacing it with a new duty. Id. at § 280(b); Crook v. Zorn, 95 F.2d 782, 783 (5th Cir.1938)(a novation creates "a new contract in place of the old one.") Under general common law, "[t]he elements of a novation are **(1) a previous, valid obligation**; (2) an agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." F.D.I.C. v. Waggoner, 999 F.2d 826, 829 (5th Cir. 1993)(emphasis added); Scarboro v. Universal C. I. T. Credit Corp., 364 F.2d 10, 14 (5th Cir. 1966)(elements are similar in most states). Here, because there was no previously valid agreement, there was no novation; therefore, the underlying duty did not discharge and a new obligation was not created.

Accordingly, because the indemnity provision in the original Consulting Agreement was void, and because the Letter Agreement did not amend the original Consulting Agreement or create a new obligation, neither Johnson nor Global Oil have a duty to defend or indemnify PSL, PPI, or any other member of the Company Group. The invalidity of the indemnity provision does not effect the validity of the remainder of the Consulting Agreement because, under the express terms of the contract, invalid terms are severable. (Rec. Doc. 319-5, p. 5)

Accordingly,

**IT IS ORDERED** that Defendant PPI Technology Services, LP ("PPI")'s **Motion for Summary Judgment on the Contractual Defense**

**and Indemnification Obligations of Global Oil Consulting, LLC (Rec. Doc. 319)** is **DENIED**.

New Orleans, Louisiana, this 11th day of March, 2014.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE