```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

| | |
|---|---|
| JAMES JOHNSON | CIVIL ACTION |
| VERSUS | NO: 11-2773 c/w 12-1534 |
| | APPLIES TO 11-2773 |
| PPI TECHNOLOGY SERVICES, L.P., et al | SECTION: "J" (3) |

### ORDER & REASONS

Before the Court is Defendant GlobalSantaFe Offshore Services Inc. ("GSF")'s **Motion for Summary Judgment (Rec. Doc. 353)**, Plaintiff James Johnson ("Johnson")'s opposition thereto (Rec. Doc. 385), and GSF's reply to the same. (Rec. Doc. 392) GSF's motion was set for hearing on March 26, 2014, on the briefs. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that GSF's motion should be **GRANTED** for the reasons set forth more fully below.

### PROCEDURAL HISTORY AND BACKGROUND FACTS

This action arises out of claims for negligence under the Jones Act and for unseaworthiness, negligence, and maintenance and cure under general maritime law. Johnson asserts that on November 8, 2010, he was working as a seaman on the HIGH ISLAND VII, a jack-up drilling rig located approximately twelve miles off of the Nigerian coast. Johnson alleges that at approximately 12:30 a.m.,

1

Nigerian gunmen boarded the rig and shot Johnson in leg with an AK-47 rifle at close range. As a result, Johnson alleges that he suffered severe damage to his leg which required numerous surgeries, a muscle transplant, and months of hospitalization.

Johnson filed suit on November 8, 2011, naming as Defendants PPI, PSL, Ltd. ("PSL"), Transocean, Ltd. ("Transocean"), and Afren, PLC. Following the filing of the original complaint, Johnson added GSF as a Defendant.[1] On September 21, 2012, the Court dismissed Afren, PLC from this action following Plaintiff's motion for voluntary dismissal. (Rec. Doc. 80) On May 31, 2013, the Court dismissed Johnson's claims against PSL based on its finding that this Court lacked personal jurisdiction over PSL. (Rec. Doc. 223) GSF then filed the instant motion on February 24, 2014.

## **PARTIES' ARGUMENTS**

GSF seeks summary judgment on all claims asserted against it by Johnson. GSF argues that Johnson 's Jones Act claim fails because GSF is not Johnson's employer. Further, GSF contends that Johnson's unseaworthiness claim fails because Johnson has judicially admitted GSF is not the owner of the vessel in question and because it is undisputed that GSF neither owned or operated the vessel. Finally, GSF avers that Johnson's general maritime negligence claim fails because it had no duty to Johnson as GSF did

---

[1] Johnson's suit was later consolidated with a related suit filed by Robert Croke. Croke's claims, however, were recently dismissed. (Rec. Doc. 364)

2

not control any of the workers, but rather only paid them. GSF avers that another entity, Transocean Support Services Nigeria Limited ("TSSN"), controlled the rig workers.

Johnson opposes GSF's motion inasmuch as it seeks summary judgment on his general maritime negligence claims. He avers that three employees–James Robertson, Tim Ashley, and Danny Ball–who were aboard the vessel the night of the incident, were employed by GSF. Johnson asserts that Ball and Ashley were responsible for security, and that Robertson knew the details of how the gunmen boarded the rig and overhead Ashley and a "security man" discuss that the security man was leaving the rig for the night. Johnson argues that, based on this evidence, it is clear that certain workers on the rig committed errors and omissions for which GSF is liable. Johnson further argues that GSF's argument that it does not actually employ any of its payroll employees fails because one who pays an employee remains their employer, even if he become a borrowed servant of another entity. Johnson does not oppose the motion as it relates to his Jones Act and unseaworthiness claims.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c));

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. Little, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." Delta, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263-64 (5th Cir. 1991) (citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." Id. at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the

4

record is insufficient with respect to an essential element of the nonmoving party's claim. See Celotex, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See id. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. See, e.g., id. at 325; Little, 37 F.3d at 1075.

## DISCUSSION

**A. Jones Act Claims**

[A]n employer-employee relationship is essential for recovery under the Jones Act. See Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 790-91(1949); Scarborough v. Clemco Industries, 391 F.3d 660, 667 (5th Cir. 2004). For purposes of recovery, it may be possible to have more than one Jones Act employer. Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447, 452 (5th Cir. 1980); Cordova v. Crowley Marine Servs., 2003 U.S. Dist. LEXIS 13567, *8 (E.D.La. 2003). Further, employer status is not contingent upon ownership of the vessel on which the plaintiff worked. Barrios v. Louisiana Construction Materials Co., 465 F.2d 1157 (5th Cir. 1972).

There is absolutely no indication that GSF was Johnson's payroll employer or that Johnson was a borrowed servant of GSF, thus GSF is not a proper Jones Act defendant. Therefore, inasmuch

as GSF seeks summary judgment in its favor on Johnson's Jones Act claims, the Court will grant the instant motion.

**B. Unseaworthiness**

For a vessel to be found unseaworthy, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used." <u>Jackson v. OMI Corp.</u>, 245 F.3d 525, 527 (5th Cir.2001). The duty to provide a seaworthy vessel is an "incident of vessel ownership," and "[t]o be held liable for breach of the duty, the defendant must be in the relationship of an owner or operator of a vessel." <u>Baker v. Raymond Int'l</u>, 656 F.2d 173, 181–82 (5th Cir.1981) (quotation marks omitted). In other words, generally speaking, the owner or operator of the vessel containing the allegedly unseaworthy condition is the proper defendant with respect to a claim of unseaworthiness. <u>Daniels v. Fla. Power & Light Co.</u>, 317 F.2d 41, 43 (5th Cir.1963) ("The idea of seaworthiness and the doctrine of implied warranty of seaworthiness arises out of the vessel, and the critical consideration in applying the doctrine is that the person sought to be held legally liable must be in the relationship of an owner or operator of a vessel.") The one exception to this general rule is that a bareboat or demise charterer who assumes full possession and control of a vessel may owe a duty of seaworthiness with respect to that vessel. <u>Baker</u>, 656 F.2d at 173; *cf.* <u>Martin v. Walk, Haydel &</u>

6

Assocs., Inc., 742 F.2d 246, 248-49 (5th Cir.1984) (where plaintiff's employer was a user, but not a demise charterer, of flatboats, the employer did not warrant the boats' seaworthiness) "If a vessel is chartered bareboat, the owner may escape liability in personam for the condition or management of the vessel at least in some circumstances. The owner therefore has the burden of establishing the facts which give rise to such relief." Complaint of Admiral Towing & Barge Co., 767 F.2d 243, 248 (5th Cir. 1985) (internal citation omitted). The owner's burden is heavy, and it must show that it "completely and exclusively relinquish[ed] 'possession, command, and navigation' of the vessel" Deal v. A.P. Bell Fish Co., 674 F.2d 438, 440-441 citing Guzman v. Pichirilo, 369 U.S. 698, 699-700 (1962).

GSF attaches as an exhibit a bareboat charter between GlobalSantaFe International Drilling, Inc. ("GSFID") and Sedco Forex International ("Sedco") wherein GSFID is defined as the owner of the HIGH ISLAND VII. (Rec. Doc. 353-5) Therefore, the two entities to choose from for liability purposes appear to be GSFID or Sedco, neither of which are named defendants in this action. Therefore, the Court will grant summary judgment in favor of GSF on this issue.

### C. General Maritime Negligence

Johnson avers that his injuries were caused by the negligent acts and omissions of certain rig workers present on the night of

the attack. In order for GSF to be liable for these actions and/or inactions, Johnson must rely on the theory of vicarious liability. Stoot v. D & D Catering Serv., Inc., 807 F.2d 1197, 1199 (5th Cir. 1987)("The recognized principle of agency law that imposes vicarious liability upon employers for the wrongful acts committed by employees while acting in the course of their employment is well ingrained in the general maritime law.") Thus, for GSF to be liable, Johnson must prove: (1) that the rig workers were negligent, and (2) that GSF employed the negligent rig workers so as to be vicariously liable for their negligence.

**1. Negligence of Rig Workers**

"To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000)(internal citation omitted). Plaintiff submits evidence that:

- James Robertson, the tool pusher on board the rig, heard the rig "security man" say to Tim Ashley that he was leaving the rig to go onshore, meaning that the rig was left without security personnel on the night of the attack (Rec. Doc. 385-2, pps. 8-10);

- Tim Ashley, the rig's OIM, and Danny Ball, the barge master, were in charge of security for the rig (Rec. Doc. 385-3, pps. 2-3);

- the night crew had moved a ball valve on the blow out preventer in front of the rig's stairs, which prevented

>   the stairs from being raised on the night of the attack (Rec. Doc. 385-2, pps. 4-6); and

- Ashley, Robertson, and Ball all received W-2s from GSF.

Given the known risk of boarding in the area,[2] those charged with security and/or their officers, agents, and employees, should have reasonably foreseen that an attack on the vessel may occur, should have taken steps to prevent that risk, and should have performed their job in such a way as to minimize that risk.[3] With that duty in mind, a reasonable jury could find that leaving the stairs down and/or leaving the rig unguarded is a breach of that duty, and that such a breach caused Johnson's injuries. See, e.g. Fall v. Esso Standard Oil Co., 297 F.2d 411, 417 (5th Cir. 1961)(in a Jones Act negligence case, jury must decide if the defendant, through his officers, agents, or employees, knew or should have known that there was a safety risk to the crew and failed to take prudent action to protect the crew.) Therefore, because a reasonable jury could find that negligence occurred, it need only be determined if those committing the negligent acts were employed by GSF so as to make GSF liable for their negligence.

---

[2] Though he is not a GSF official, there is evidence that Jack Rankin had expressed concerns regarding the possiblity of a boarding. (Rec. Doc. 386-10, p. 3). Further, there was a provision in the contract between TSSN and Afren concerning security of the rig and various security measures were in place, likely in response to the commonly known risk of a boarding. See Rec. Doc. 353-8.

[3] There is no indication that GSF was the entity charged with securing the vessel, thus the only viable theory of recovery is that, as the employer of the rig workers who played a role in security, GSF could be vicariously liable for their employees' negligence.

### 2. Vicarious Liability of GSF

It is undisputed that Ashley, Robertson, and Ball all received W-2s from GSF. Johnson avers that this makes GSF the employer of Ashley, Ball, Robertson, and other rig workers and draws parallels to Jones Act cases wherein the "payroll employer" of seamen may be held liable for a seaman's injuries. GSF argues that they should not be liable for the acts and omissions of the aforementioned rig workers because it was merely a "paymaster" and did not exercise and day-to-day control over the workers or rig security. The issues that must be resolved, then are: (1) whether GSF is merely a "paymaster," and (2) whether a "paymaster" may be considered the rig workers' employer in the context of vicarious liability for negligence under general maritime law. The latter question appears to be an issue of first impression in this Circuit.

### a. Is GSF a "Paymaster"?

A "paymaster" is "an officer or agent whose duty it is to pay salaries or wages," or "[a]n official who pays troops or workers." *Paymaster Definition*, MERRIAM-WEBSTER ONLINE, http://www.merriam-webster.com/dictionary/paymaster (last visited Mar. 26, 2014); *Paymaster Definition*, OXFORD DICTIONARIES ONLINE, http://www.oxforddictionaries.com/us/definition/american_english/paymaster (last visited Mar. 26, 2014). From cases involving paymasters, it appears that a paymaster is usually presented with a worker's or troop's claim for pay, and the paymaster satisfies

10

the claim on behalf of the employer. See Stevens v. U.S., 41 Ct. Cl. 344, 345 (Apr. 23, 1906); Pikna v. The Telfair Stockton, 174 F.2d 472, 472 (4th Cir. 1949). Historically, such claims were made in person, so, for example, a seaman who was discharged from the rig would present himself to the paymaster's office for payment, or a paymaster would come aboard the vessel and settle all claims for wages. Thomas v. SS Santa Mercedes, 572 F.2d 1331, 1333-34 (9th Cir. 1978); Pikna, 174 F.2d at 472. There is nothing to say, though, that the manner in which a paymaster effects his role cannot be updated through modern technology.

In GSF's corporate deposition, Bradley McKenzie, Transocean Offshore Deep Water Drilling, Inc. ("TODDI")'s global payroll manager deposed that, at the time of the incident and the deposition, he was responsible for overseeing and distributing payroll for the U.S. national population, which is defined as all U.S. citizens working on or offshore in the U.S. and the Gulf of Mexico, and for the expatriate population, which includes U.S. and non-U.S. citizens working outside of their home country. (Rec. Doc. 353-6, pps. 4, 6) He explains that Transocean Deep Water, Inc. is likely the entity appearing on the W-2s for national workers and that GSF is the entity listed on W-2s for expatriates. (Rec. Doc. 353-6, pps. 4-6) Local workers, who are defined as non-U.S. citizens employed in Transocean offices in their home country, are paid by the local office. (Rec. Doc. 353-6, p. 6) McKenzie stated

that whether a worker is paid by GSF or another entity is not "rig-dependant," but rather depends on whether they are classified as an expatriate worker or a national worker. (Rec. Doc. 353-6, p.4) Thus, several workers on a rig could be paid by different entities, and, if a worker moves from one vessel to another, his paychecks would still come from GSF. The actual individual who signs the paychecks issued by GSF is the controller who works for TODDI in Houston.[4] McKenzie also stated that, to his knowledge, GSF does nothing other than issue payroll. (Rec Doc. 353-6, p. 13)

Beyond this role, GSF contends that it has no other involvement in this matter and that it is Transocean Support Services Nigeria, Ltd. ("TSSN") who controlled the rig workers. Emeka Ochonogor, a rig manager for TSSN, submitted an affidavit wherein he states that, in November 2010, TSSN was supplying two rigs to Afren Resources, Ltd. ("Afren Nigeria"), one of which was the HIGH ISLAND VII. (Rec. Doc. 353-8, p. 2, ¶ 4) As primary rig manager, Ochonogor's primary duties were to supervise other TSSN rig managers who were in charge of supervision for the HIGH ISLAND VII. (Rec. Doc. 353-8, p. 2, ¶ 5) Those rig managers were, Cyrille Yatte, asset rig manager, and Craig White, performance rig manager. (Rec. Doc. 353-8, p. 2, ¶ 5). Ochonogor explained that White, as performance rig manager, supervised day-to-day operations of the

---

[4] McKenzie did not know the identity or location of the controller in 2010; however, David Tonnel, a TODDI employee located in Houston, signed GSF's paychecks in 2012 at the time McKenzie's deposition was taken. (Rec. Doc. 353-6, pps. 6-7)

HIGH ISLAND VII and its crew and that any security issues would be reported to the TSSN rig manager. (Rec. Doc. 353-8, pps. 2-3, ¶ 6, 9-10) Finally, Ochonogor states that the HIGH ISLAND VII's crew was comprised entirely of TSSN employees. (Rec. Doc. 353-8, p. 2, ¶ 8) Ochonogor claims that he had never heard of GSF or TODDI prior to this lawsuit. (Rec. Doc. 353-8, p. 3, ¶ 13-14).

Johnson contends that GSF's role did go beyond the single task of issuing paychecks to expatriates, as evidenced by the facts that:

- GSF operates out of Greenway Plaza in Houston ("Greenway") and several workers deposed that they received training in Greenway; and

- Every worker from the HIGH ISLAND VII that was deposed stated that Ashley, a GSF employee, was their supervisor;

- Workers subjectively believed that they worked for "Transocean"

These few facts, which are only marginally applicable to the instant analysis, are not sufficient to create an issue of material fact as to whether GSF exerted any control over workers beyond the issuance of paychecks. The workers' belief that they worked for "Transocean" is not illustrative or helpful to Johnson's argument because he is trying to prove that they worked for GSF. Further, by relying on the fact that the workers reported to Ashley, Johnson presumes that the Court accepts his argument that Ashley is a GSF

employee.[5] Ashley is no different from the rest of the workers, however, in that he was paid by GSF based on his status as an expatriate employee, but was actually controlled by a different entity. Finally, the location of training does not definitively prove that GSF had a role in training workers because it is undisputed that GSF and other Transocean entities are all related in some fashion, thus it is more than conceivable that the training held in Houston was a TSSN training, as it seems impractical to fly U.S. citizens to Nigeria for training.

Therefore, Johnson has not produced sufficient evidence to prove that GSF's limited role amounts to anything more than a paymaster. In light of the facts presented, GSF's role does not even amount to that of a payroll manager, as the record shows that it is McKenzie who fills that role. Based on this limited role of issuing to workers the pay that they are owed, and on a comparison of GSF and the individual paymasters described in case law, it appears that GSF is in fact a paymaster only.

### b. Is a Paymaster an "Employer"?

GSF offers no direct legal support for the notion that a paymaster should not be considered an employer, and it appears that no court has decided this exact issue. GSF argues, though, that despite the fact that payment of wages is often a hallmark of

---

[5] As is discussed below in Section C.2.b, the Court cannot readily accept the argument that Ashley is a GSF employee solely based on the fact that GSF paid him.

employer status, it should not be dispositive in the instant matter because GSF had no other connection to the workers. In making this argument, GSF appears to endorse the argument that a "right-to-control" test should apply here. Johnson, on the other hand, contends that, because a "payroll employer" who exerts no control over its nominal employees can be held liable under the Jones Act, such "payroll employers" may also be held vicariously liable for its employee's negligence under general maritime law.

There is no set test for determining whether an employer-employee relationship exists. In Jones Act cases, the analysis depends on which party is sued. If the defendant is the payroll employer, courts "focus on whether the payroll employer has divested itself of all control over the employee [because, u]nless this has happened, the employee is entitled to look no further than the signature on his check." Guidry, 614 F.2d at 454. If the defendant is not the payroll employer, the plaintiff "must prove the employment relationship. The possibility of some control over his actions, however small, does not suffice. Instead, [the seaman] must show, considering all the factors, such as the circumstances of his work for [the borrowing employer] and the nature of whatever continuing relationship he had with [the payroll employer], that [the payroll employer] retained an employment relationship with him." Id. at 455. To prove that a seaman is a borrowed employee, the Court looks at several factors which focus on who pays the

seaman, who controls his work, whose work he performs, etc. Ruiz v. Shell Oil Co., 413 F.2d 310, 313 (5th Cir. 1969)

Outside of the Jones Act context, and in the context of an independent contractor analysis, the Fifth Circuit has adopted "a hybrid [test] which considers the 'economic realities' of the work relationship as an important factor in the calculus, but which focuses more on the extent of the employer's right to control the 'means and manner' of the worker's performance."[1] Mares v. Marsh, 777 F.2d 1066, 1067 (5th Cir. 1985)(explaining that the traditional common law approach turns on the employer's right to control.) In yet another context, in an NLRA case, the Fifth Circuit found that two employers were "joint employers" because "[t]he evidence showed [the entities] would share, or co-determine, those matters governing essential terms and conditions of employment." Ref-Chem Co. v. N. L. R. B., 418 F.2d 127, 129 (5th Cir. 1969)(where one entity gave to another "the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, pass on changes in pay and overtime allowed.")

Though the exact test to apply when determining if an employer-employee relationship exists is unclear, there is a common theme coursing through the above-referenced tests: control. Even under the Jones Act, courts will only consider a "payroll employer" to be a proper defendant if it has not "divested itself of all

16

control over the employee." Guidry, 614 F.2d at 454.[6] Further, the atypical and somewhat relaxed standard applied under the Jones Act is likely a result of the fact that the Jones Act is "for the benefit and protection of seamen who are peculiarly the wards of admiralty." The Arizona v. Anelich, 298 U.S. 110 (1936) (The Act's "purpose was to enlarge that protection, not to narrow it.") Thus, this seemingly lower threshold cannot be transposed onto standard negligence claims brought pursuant to general maritime law. While general maritime law will often involve seamen, thus arguably should be subject to the same relaxed standards, GSF is not and could never be considered Johnson's Jones Act employer under these facts, and the Court declines to expand the protections of the Jones Act beyond the reaches of the statute.

Therefore, the Court finds that the more traditional common law approach, which requires an element of control, should apply here. As the Court already determined above that GSF was simply a paymaster and exerted no control over the rig workers, GSF cannot be considered an employer under such "control tests," thus GSF cannot be held vicariously liable for the rig worker's alleged negligence.

---

[6] Here, it appears that GSF had divested itself of all control over the rig workers; and, even if it had retained some control, the notion under the Jones Act that a payroll employer is a *proper defendant* does not mean that it is liable under the Jones Act. Rather, in Guidry, the court notes that injured seaman may file suit against the payroll employer and leave "that company and the borrowing company to sort out between them the ultimate liability," but does not hold that the payroll employer will be ultimately liable. Id.

17

Accordingly,

**IT IS ORDERED** that Defendant GlobalSantaFe Offshore Services, Inc.'s **Motion for Summary Judgment (Rec. Doc. 353)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff James Johnson's claims against GlobalSantaFe Offshore Services, Inc. are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 3rd day of April, 2014.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE