UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES JOHNSON                          CIVIL ACTION

VERSUS                                 NO: 11-2773 c/w
                                       12-1534

                                       APPLIES TO 11-2773

PPI TECHNOLOGY SERVICES,               SECTION: "J" (3)
L.P., et al

**ORDER & REASONS**

Before the Court is Defendant PPI Technology Services, LP ("PPI")'s **Motion for Summary Judgment on Employment Status, Lack of Legal Duty, and Lack of Evidence of Breach (Rec. Doc. 355),** Plaintiff James Johnson ("Johnson")'s opposition thereto (Rec. Doc. 386), PPI's reply memorandum (Rec. Doc. 405), Johnson's surreply. (Rec. Doc. 406) PPI's motion is set for hearing on March 26, 2014, on the briefs. Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that PPI's motion should be **GRANTED** for the reasons set forth more fully below.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

This action arises out of claims for negligence under the Jones Act and for unseaworthiness, negligence, and maintenance and cure under general maritime law. The Court has summarized the facts of this case numerous times, thus only the pertinent facts will be

1

repeated below.

Johnson asserts that on November 8, 2010, he was working as a seaman on the HIGH ISLAND VII, a jack-up drilling rig located approximately twelve miles off of the Nigerian coast. Johnson alleges that at approximately 12:30 a.m., Nigerian gunmen boarded the rig and shot Johnson in leg with an AK-47 rifle at close range. As a result, Johnson alleges that he suffered severe damage to his leg which required numerous surgeries, a muscle transplant, and months of hospitalization.

Johnson filed suit on November 8, 2011, naming as Defendants PPI, PSL, Ltd. ("PSL"), Transocean, Ltd. ("Transocean"), and Afren, PLC. Following the filing of the original complaint, Johnson added GlobalSantaFe Offshore Services, Inc. as a Defendant.[1] In his complaint, Johnson asserts that Defendants were negligent, that the HIGH ISLAND VII was unseaworthy, and that PPI is responsible for the payment of Johnson's maintenance and cure benefits. On September 21, 2012, the Court dismissed Afren, PLC from this action following Plaintiff's motion for voluntary dismissal. (Rec. Doc. 80) On May 31, 2013, the Court dismissed Johnson's claims against PSL based on its finding that this Court lacked personal jurisdiction over PSL. (Rec. Doc. 223) PPI filed a motion to dismiss Johnson's claims early on in litigation; however, that

---

[1]Johnson's suit was later consolidated with a related suit filed by Robert Croke. Croke's claims, however, were recently dismissed. (Rec. Doc. 364)

motion was converted to a motion for summary judgment and was denied. (Rec. Docs. 7, 44) PPI then filed the instant motion, in which it re-urges many of the arguments from its earlier motion.

## PARTIES' ARGUMENTS

PPI's arguments are fairly straightforward. First, it contends that it is not Johnson's employer, thus it cannot be liable under the Jones Act or for the payment of maintenance and cure. In the alternative, even if the Court finds that PPI is Johnson's employer, PPI asserts that it had no duty to provide adequate security for the vessel because it did not exercise any control over security matters. Based on this lack of duty, PPI argues that it also cannot be liable for negligence under general maritime law. Further, PPI avers that even if there were a duty under the Jones Act or general maritime law, Plaintiff has not identified any particular act or omission that would constitute a breach of that duty. Finally, in regards to the unseaworthiness claim, PPI asserts that it is not liable because PPI is not and was not the owner and/or operator of the vessel.

Johnson contends that there are only three possible entities that could be Johnson's employer: PPI Technology Nigeria, Ltd. ("PPIN"), PPI, or PSL. Of these three entities, Johnson avers that PSL is a shell company operating out of Belize with which Johnson had no interaction and that PPIN is a labor broker operating out of an apartment in Nigeria that admittedly gave no day-to-day

3

instructions to Johnson. (Rec. Doc. 386-9, p. 6) Rather, PPI employees, including Jack Rankin ("Rankin"), Galan Williams ("Williams"), and Ron Thomas ("Thomas"), interacted with and supervised Johnson on a daily basis. Johnson further submits evidence that Johnson had extensive communications with other PPI employees such as Sandra Birkline, an administrative assistant, and Scott Kirklin, PPI's general counsel, before, during, and after his employment and injury and that PPI retained the sole authority to terminate Johnson.

Johnson next argues that, because PPI is Johnson's employer, it is clear that PPI owed Johnson a duty to provide a reasonably safe work environment under the Jones Act and that such a duty extends to protection from third parties' tortious acts. Further, even if PPI is not his employer, Johnson argues that PPI is liable under general maritime law because PPI executives Thomas and Rankin knew that the rig was more likely to be boarded when it was moved closer to shore, but did not communicate that risk to Johnson.

Johnson did not make any arguments specifically concerning PPI's challenges to his maintenance and cure and unseaworthiness claims.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." <u>Celotex Corp.</u>
<u>v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing F<small>ED</small>. R. C<small>IV</small>. P. 56(c));
<u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).
When assessing whether a dispute as to any material fact exists,
the Court considers "all of the evidence in the record but refrains
from making credibility determinations or weighing the evidence."
<u>Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.</u>, 530 F.3d
395, 398 (5th Cir. 2008).  All reasonable inferences are drawn in
favor of the nonmoving party, but a party cannot defeat summary
judgment with conclusory allegations or unsubstantiated assertions.
<u>Little</u>, 37 F.3d at 1075. A court ultimately must be satisfied that
"a reasonable jury could not return a verdict for the nonmoving
party." <u>Delta</u>, 530 F.3d at 399.

    If the dispositive issue is one on which the moving party will
bear the burden of proof at trial, the moving party "must come
forward with evidence which would 'entitle it to a directed verdict
if the evidence went uncontroverted at trial.'" <u>Int'l Shortstop,</u>
<u>Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1263-64 (5th Cir. 1991)
(citation omitted).  The nonmoving party can then defeat the motion
by either countering with sufficient evidence of its own, or
"showing that the moving party's evidence is so sheer that it may
not persuade the reasonable fact-finder to return a verdict in
favor of the moving party." <u>Id.</u> at 1265.

    If the dispositive issue is one on which the nonmoving party

5

will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.  See Celotex, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  See id. at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  See, e.g., id. at 325; Little, 37 F.3d at 1075.

## DISCUSSION

### A. Johnson's Employment Status

PPI contends that it cannot be held liable under the Jones Act and is not responsible for the payment of maintenance and cure claims because PPI was not Johnson's employer. This issue was already subject to the Court's review when Chief Judge Sarah Vance was presiding over this matter.

In her Order and Reasons on this issue, Chief Judge Vance explained that while an employer-employee relationship is required to recover under the Jones Act and for entitlement to maintenance and cure benefits, there can be multiple Jones Act employers, and it is the degree of control that the defendant exerts that weighs most heavily in this determination. (Rec. Doc. 44, pps. 12-14) After laying out this standard, Chief Judge Vance denied PPI's

6

motion for summary judgment[2] because Johnson submitted an affidavit with supporting evidence "detailing his extensive involvement with PPI personnel during the hiring process, during his employment aboard the rig, and following his injury" that PPI was not able to contradict. Id. at 14-16.

In the instant motion, Johnson asserts nearly the same set of facts as he presented in response to PPI's first motion for summary judgment; however, the record is much more fully developed at this late stage in litigation and PPI has submitted evidence to rebut Johnson's assertions, so the Court must re-evaluate PPI's contentions in light of these new facts.

When a seaman is not a nominal employee of a defendant, the defendant may still be a proper Jones Act defendant if the seaman is a borrowed servant. The Fifth Circuit has explained that:

> [T]he borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work. It may also determine which of the possible employers ultimately bears the cost of the injury.

Baker v. Raymond Int'l, Inc., 656 F.2d 173, 178 (5th Cir. 1981)(internal citations omitted); Spinks v. Chevron Oil Co., 507 F.2d 216, 224 (5th Cir. 1975) decision clarified, 546 F.2d 675 (5th

---

[2] PPI initially filed a motion to dismiss, but the Court converted it to a motion for summary judgment because the parties attached several agreements and documents to the motion that were not referenced in Johnson's complaint. (Rec. Doc. 44, pps. 9-10)

Cir. 1977) and <u>overruled on other grounds by</u> <u>Gautreaux v. Scurlock</u>

<u>Marine, Inc.</u>, 107 F.3d 331 (5th Cir. 1997)("If a prime contractor

has assumed enough of the incidents of an employer, such as the

right to control an employee's work, he will be deemed a seaman's

employer"). Explaining how and why a Jones Act plaintiff may be

said to have two employers, the Fifth Circuit reasoned that if

> the worker is hired and paid by a subcontractor, he may
> look to it as his employer even though, on the job, he
> worked under the direction and control of the principal
> contractor. When the contractual or operational
> relationship between those who direct a seaman's work
> results in his being on the payroll of one company and
> obeying the behest of another, the injured worker is not
> required to bear the risk that he will not select the
> proper target for his claim.

<u>Baker</u>, 656 F.2d at 178. In such situations, the plaintiff

could file claims against either company.

The Fifth Circuit uses a nine factor test from <u>Ruiz v. Shell</u>

<u>Oil Co.</u>, 413 F.2d 310, 313 (5th Cir. 1969) to determine borrowed

servant status. These nine factors are:

1. Who has control over the employee and the work he
   is performing, beyond mere suggestion of details or
   cooperation?
2. Whose work is being performed?
3. Was there an agreement, understanding, or meeting
   of the minds between the original and the borrowing
   employer?
4. Did the employee acquiesce in the new work
   situation?
5. Did the original employer terminate his
   relationship with the employee?
6. Who furnished tools and place for performance?
7. Was the new employment over a considerable length
   of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?

<u>Barrios v. Freeport-McMoran Res. Partners Ltd. P'ship</u>, No. 93-0092, 1994 WL 90456, *2 (E.D. La. Mar. 11, 1994) (Livaudais, J.); <u>Baker</u>, 656 F.2d at 178.  "No one factor is determinative, and courts are instructed to look to the "venture as a whole." <u>Cosmopolitan Shipping Co. v. McAllister</u>, 337 U.S. 783, 795 (1949). Whether Johnson is the borrowed servant of PPI is a question of law; however, "[i]f some of the factors involve a factual dispute those factors must be submitted to the jury, unless a sufficient number of the other factors clearly favor summary judgment." <u>Capps v. N.L. Baroid-NL Industries, Inc.</u>, 784 F.2d 615, 617 (5th Cir.1986) (citing <u>Gaudet v. Exxon Corp.</u>, 562 F.2d 351, 357-58 (5th Cir.1977)), cert. denied 479 U.S. 838 (1986); <u>Barrios</u>, 1994 WL 90456 at *2. The <u>Ruiz</u> factors are considered below.

**1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?[3]**

Plaintiff avers that PPI exercised control over him and his work. In support of this contention, Plaintiff deposed that his direct supervisors, Rankin, Thomas, and Williams, were all PPI employees. (Rec. Doc. 355-8, p. 35) Johnson indicates that he gave daily reports to Williams, and sometimes to Rankin. (Rec. Doc. 386-

---

[3] In determining who has control, the <u>Ruiz</u> court warns district courts that "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking. Co-operation, as distinguished from subordination, is not enough to create an employment relationship." <u>Ruiz</u>, 413 F.2d at 313 (internal citations omitted).

1, pps. 2-3) Further, Johnson submits that he had extensive interaction with PPI employees before, during, and after his employment and injury. For example, PPI employee Sandra Birkline coordinated all administrative issues such as travel to-and-from Nigeria, hiring paperwork, insurance claims following the attack, etc. Further, Scott Kirklin, general counsel for PPI, communicated frequently with Johnson following the attack.

Defendant does not dispute that Rankin, Williams, and/or Thomas supervised Johnson, but it argues that none of these men worked for PPI. (Rec. Doc. 355-1, p.11) Thomas claims that he was acting as a Drilling Advisor for Afren Energy Service, Ltd. ("Afren Nigeria"), was supplied to Afren Nigeria by PPIN, and that he was paid by an entity named CIMA Management (Rec. Doc. 355-9, p.15).[4] Defendants claim that Williams and Rankin were both PSL consultants that PPIN supplied as Afren Nigeria Project Managers.[5] Additionally, Defendant avers that Johnson was "controlled" by the well plan—in the sense that he was bound to follow it—and the well plan belonged to Afren Nigeria. Williams corroborated this

---

[4] The CIMA set-up is not fully explained; however, that is not relevant because it appears from Schwarz's deposition that PSL paid him through his CIMA policy and/or account. (Rec. Doc. 386-9, p.7)

[5] Emeka Ochonogor, and employee of Transocean Support Services Nigeria Limited ("TSSN"), deposed that Williams and Rankin were PPIN personnel working on behalf of Afren Nigeria (Rec. Doc. 355-11, p. 6) Kent Schwarz, an employee of PSL who serves as the Managing Director of PPIN, deposed the same. (Rec. Doc. 355-11, p. 6) Juan Garza, a PSL consultant who held the same position as Johnson, deposed that Williams was from the Afren office and was his direct supervisor, that Garza and Johnson were the company men for Afren Nigeria, and that "the only thing that [he knew] about PPI was the paperwork that was done for his visa." (Rec. Doc. 355-13, p. 4-5)

sentiment, stating that "[a]ll programs, all engineering, all rig supervision, [...] they're all Afren positions and we all work for Afren [...] as consultants." (Rec. Doc. 355-10, p. 25)

Johnson contends that there is at least an issue of material fact regarding who these individuals actually work for because, despite their official titles, they often held themselves out as PPI employees, Thomas was the President of PPI (Rec. Doc. 386-7), and Williams was the Vice President of PPI. (Rec. Doc. 355-10, p. 66-67)  Johnson further provides a series of e-mails showing that Rankin's e-mail address was from PPI, and more importantly, that Rankin's signature block stated "Afren Energy Ebok Development Project, PPI Technology Services." (Rec. Doc. 386-6, p. 24)

Despite the Plaintiff's confusion regarding who Rankin, Thomas, and Williams worked for, it may be reasonably concluded that they each worked for either PPIN, Afren, or PSL, but not for PPI. Further, Plaintiff cites no case in support of his contention that, in analyzing this factor, the Court should consider Johnson's subjective beliefs or analyze who each person held themselves out to work for. In fact, under very similar facts in <u>Baker</u>, the Court did not find it relevant to the borrowed servant analysis that the plaintiff was confused about the identity of his employer.[6]

---

[6]  In <u>Baker</u>, the defendant recruited the plaintiff to work on a vessel, worked with him in pre-employment negotiations, sent monthly time sheets with the defendant's name on it, and filled out certain benefit forms—such as a life insurance policy–wherein the defendant was listed as plaintiff's employer. <u>Baker</u>, 656 F.2d at 179. The <u>Baker</u> plaintiff's employment contract was with a different entity, but one of the defendant's employees explained to

Therefore, because Johnson and his work on the vessel were not controlled by PPI, this factor weighs against finding that Johnson is PPI's borrowed servant.

**(2) Whose work is being performed?**

On a broad level, it is fairly clear that, Johnson was performing Afren Nigeria's work, as Afren Nigeria was the customer who owned the rights to the minerals. (Rec. Doc. 355-12, pps. 4-6) Williams testified that "[a]ll programs, all engineering, all rig supervision,[...] they're all Afren positions and we all work for Afren [...] as consultants." (Rec. Doc. 355-10, p. 25) Further, even on a more narrow level, it seems improper to say that Johnson was performing PPI's work.  PPI was contracted to provide *support* services to PPIN, not actual drilling services. (Rec. Doc. 355-6, pps. 1-2) So, because it was PPIN who was ultimately responsible for drilling services, Johnson's services would be performed for PPIN, not PPI. Therefore, this factor weighs against a finding that Johnson was a borrowed servant of PPI.

**(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?**

PSL is the alleged original employer, thus the question is whether there was an agreement between PSL and PPI regarding Johnson.  There was a consulting agreement between PSL and PPI

---

the plaintiff that the defendant and the company named on the contract were the same and that the non-defendant company was used for "tax purposes" only. <u>Id.</u> The Fifth Circuit reversed a jury's finding that the plaintiff was a borrowed servant. <u>Id.</u>

"for the benefit of PSL to retain PPI supply, technical, accounting, legal, marketing, administrative, and logistical support to its wholly owned subsidiary, PPI Technology Services Nigeria Limited." (Rec. Doc. 355-6, p.1) PPI believed and still maintains that it had no real control or direction over Johnson, but rather provided support to PPIN under the terms of a contract between PSL and PPI. PSL, PPI, and PPIN all saw PPI as a service provider or facilitator for PPIN. (Rec. Doc. 355-12, pps. 4-8) Though their procedure is rather fractured, PSL, PPI, and PPIN all seemed to understand their arrangement, thus this factor weighs against a finding that Johnson was PPI's borrowed servant.

**(4) Did the employee acquiesce in the new work situation?**

Johnson clearly believed that he worked for PPI. (Rec. Doc. 386-1) PPI asserts that this subjective belief is unfounded because Johnson signed the Consulting Agreement that stated on its face that it was a contract between PSL and Johnson, and later, between PSL and Global Oil.[7] Johnson contends that his belief is founded, however, because:

- he was led to believe that the PSL entity was just a formality based on statements made by Birkline, a PPI employee, wherein she said that "PSL is our [PPI's] international entity that we run all of our international guys thru [sic]" (Rec. Doc. 386-6, p.5);

- his initial contact regarding this position was with John Arriaga, a corporate recruiter who was a PPI employee (Rec.

---

[7] Global Oil was substituted as a party to the Consulting Agreement after Johnson initially signed the contract individually.

13

Doc. 386-1, p.1; Rec. Doc. 386-2, p. 2);

- Rankin's signature block stated "Afren Energy Ebok Development Project, **PPI Technology Services**" (Rec. Doc. 386-6, p. 24) (emphasis added);

- all e-mail addresses of people with which Johnson interacted were PPI e-mail addresses. (Rec. Doc. 386-6)

"The issue to be resolved under this factor is whether [Plaintiff] had an opportunity to observe the conditions under which he was working and whether, after such an opportunity, he chose to continue working." Barrios, 1994 WL 90456 at *2. Johnson worked on the HIGH ISLAND VII, from mid-April through early-November 2010, and he never chose to discontinue work. This factor is not especially helpful, though, because the "conditions" at issue are not physical conditions that one can observe readily, rather, the conditions involved a complex corporate structure that was likely to go unnoticed until an issue, such as the current litigation, arose. Therefore, while this factor balances somewhat against finding that Johnson was PPI's borrowed servant, it will not be given much weight.

**(5) Did the original employer terminate his relationship with the employee?**

PSL continued to pay Johnson on a monthly basis throughout his employment. Save for the signing of Johnson's Consulting Agreement at the onset of his employment, this is essentially the only interaction that PSL and Johnson ever had, and it remained constant throughout the duration of Johnson's employment. Therefore, this

14

factor weighs against finding that Johnson was PPI's borrowed servant.

**(6) Who furnished the tools and place for performance?**

PPI argues that it did not furnish tools and a place for performance to Johnson, and Johnson offers no evidence to the contrary. Further, PPI points to (1) evidence that GlobalSantaFe was the owner of the vessel and that Sedco Forex International was the bareboat charterer (Rec. Doc. 179-8); (2) deposition testimony that PPI was not the owner of the vessel or its appurtenances (Rec. Doc. 355-8, pps. 28-30); and (3) deposition testimony from Robert Croke that PPI did not have any equipment on the vessel and that Transocean had control over the actual equipment and the vessel itself. (Rec. Doc. 355-5, pps. 19-20)  Schwarz's deposition also reveals that PSL and PPI were on the "services" side of the Afren Nigeria operation, as opposed to the "rig side," and that the rig side of the operation would be the party responsible for furnishing the rig and its appurtenances. (Rec. Doc. 355-12, pps. 4-8) Therefore, this factor weighs against finding that Johnson was PPI's borrowed servant.

**(7) Was the new employment over a considerable length of time?**

There was never any "new employment" in this situation. Rather, Johnson's employment situation was always one of acting as a consultant for PSL that was hired through PPI to work for PPIN's benefit, and Johnson allegedly never learned of this arrangement.

15

Therefore, this factor weighs against finding that Johnson was PPI's borrowed servant, but will be given minimal weight as it is not especially illuminating.

**(8) Who had the right to discharge the employee?**

In <u>Spinks</u>, the court was charged with determining whether an independent contractor who was in the business of supplying workers for vessels was a Jones Act employer. <u>Spinks</u>, 507 F.2d at 224. There, the court found it relevant that the independent contractor in question also employed the plaintiff's supervisor, who had the power to fire plaintiff, and the court found that such a fact weighed in favor of finding that plaintiff was a borrowed servant of the independent contractor. <u>Id.</u> The court found that the record strongly supported the inference that the operator had no power to fire the plaintiff, but rather only had the power to instruct the independent contractor to terminate the plaintiff and replace him with a new one. <u>Id.</u>

Based on the evidence in the instant record, <u>Spinks</u> applies here. Williams deposed that, on the individual level, he, Thomas, and Randy Sullivan had the capacity to terminate Johnson. (Rec. Doc. 355-10, pps. 22-23) Randy Sullivan is the CEO of PPI.[8]  He also indicated that the Country Manager of PPI could terminate

---

[8] The Court never saw where the parties explained Mr. Sullivan's role; however, PPI's website reveals that Randy Sullivan is in fact PPI's CEO. PPI Technology Services LLC, Our Company, B. Randy Sullivan, http://www.ppitech.net/index.php/about-ppi/ppi-team/1-b-randy-sullivan (last visited Mar. 24, 2013 at 2:31 p.m.)

Johnson. (Rec. Doc. 355-10, p. 23). Based on these facts, it appears that some PPI employees had the some power to terminate Johnson, and that other entities in this complex structure would only be able to tell[9] PPI to fire Johnson; therefore, this factor weighs slightly in favor of a finding that Johnson was PPI's borrowed servant.

**(9) Who had the obligation to pay the employee?**

PPI points to 88 pages of bank records which indicate that PSL was the only entity that ever paid Global Oil, which, as noted above, is the corporate structure through with Johnson chose to be compensated. (Rec Doc. 319-7) This factors weighs against finding that Johnson was PPI's borrowed servant.

---

After considering the nine <u>Ruiz</u> factors and considering the venture as a whole, it is clear that: (1) PPI, PPIN, and PSL created a complex corporate structure which is not easily understood, and (2) that Johnson did not appreciate the complexity of this structure when employed as a drilling rig supervisor. The record reveals that Afren Nigeria, the operator, contracted with PPIN to provide drilling services. PPIN, lacking the infrastructure

---

[9] The weight of this is only slight because, it seems reasonable to conclude that it was actually PPIN who held the power to decide who would be fired, and then PPI support personnel would carry out the firing. This is supported by a clause in contract between Afren Nigeria and PPIN that states: "[Afren Nigeria] may instruct [**_PPIN_**] to remove from the WORKSITE any person engaged in" certain conduct laid out in the agreement. (Rec. Doc. 355-7, p. 3, cl. 9.8)

to provide such drilling services in its entirety, contracted with PSL to provide manpower. PSL then turned to PPI to provide operational support. Essentially, PSL appears to have contracted out the entirety of its functions to PPI while only retaining the role of actually funding the consultants that were hired. Though Johnson did not seem to understand this structure, it appears from deposition testimony cited above that most others did. In determining where Johnson fits into this corporate structure, the Court finds the facts in Baker to be both strikingly similar and instructive. Baker, 656 F.2d at 179. There, the defendant recruited the plaintiff to work on a vessel, worked with him on pre-employment matters, sent monthly time sheets stamped with the defendant's name, and filled out certain benefit forms–such as a life insurance policy–wherein the defendant was listed as plaintiff's employer. Id. The Baker plaintiff's employment contract, however, was with a different entity; but, one of the defendant's employees explained to the plaintiff that the defendant and the company named on the contract were the same and that the non-defendant company was used for "tax purposes" only. Id. At trial, a jury found that the plaintiff was the defendant's borrowed servant. Id. The Fifth Circuit reversed the jury's verdict, finding that the defendants presented uncontroverted evidence that another one of the defendant's affiliates employed the plaintiff and master of the vessel and its crew, operated the vessel, and paid the

seaman's wage; therefore the plaintiff's beliefs were unfounded and he was not the defendant's borrowed servant. Baker, 656 F.2d at 179.

The Fifth Circuit's ruling in Baker makes it clear that Johnson's beliefs, no matter how justified, are only part of the equation, and that the Ruiz factors are controlling. Johnson's evidence does show that PPI retained some of the authority to terminate Johnson and that PPI had some overlap amongst employees—namely Williams and Thomas. Further, it is clear that Johnson interacted extensively with people affiliated with and/or employed by PPI. These nominal employees of PPI, however, were working in support of PSL pursuant to a contract. Further, and as was the case in Baker, such executive tasks cannot overcome the heavy weight of the other Ruiz factors and the fact that PPI did not operate the vessel, it did not pay Johnson, and it did not employ any other members of the crew. PPI could not authoritatively instruct Johnson how to carry out his substantive role, but rather it was Afren Nigeria and PPIN who were charged with that role. In fact, in light of the record, it seems that Johnson errs in setting up the borrowed servant issue between PPI and PSL. Instead, it appears that it should be framed as a question of whether Johnson worked for PSL, Afren Nigeria, PPIN, or a combination of the three. None of these entities are currently parties to this litigation, however, so the Court cannot expand on that issue.

Based on the evidence and the argument of the parties, as well as a consideration of the _Ruiz_ factors, the Court finds that PPI is not Plaintiff's Jones Act employer; therefore, the Court will grant summary judgment on Johnson's Jones Act and maintenance and cure claims.

**B. General Maritime Negligence**

Plaintiff contends that even without an employee-employer relationship, PPI may be liable for negligence under general maritime law. Plaintiff bases his negligence claims on two theories: (1) PPI failed to provide a safe place to work, and (2) PPI failed to inform Johnson of the known[10] risk that gunmen would board the vessel due to its close proximity to the shore. Johnson's first theory necessarily fails because PPI had no control over the vessel and was not Johnson's employer, thus it is clear that PPI had no duty to provide a safe work environment on a vessel that it did not control to a seaman that it did not employ. As to the second theory, PPI contends that it had no duty to Johnson, and even if it did, it did not breach that duty because regular safety drills were conducted.

"To establish maritime negligence, a plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the]

---

[10] Plaintiff submits the deposition of Thomas, PPI's CEO, wherein he stated that Rankin had "expressed concerns about making sure that everybody knew the protocols [...and was] following the procedures because, you know, you are close to shore." (Rec. Doc. 386-10, p. 3)

plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000)(internal citation omitted). Ultimately, the Court must decide if PPI had a duty to inform Johnson specifically that the vessel's proximity to the shore increased the chance that the vessel would be boarded by gunmen. If there is a duty, it would necessarily be breached because PPI does not argue that it informed Johnson specifically of the risk that the vessel would be boarded, but rather PPI indicates that lockdown and safety drills were performed (by other entities who were responsible for safety) and that such actions were sufficient to protect those on board the vessel.

"[T]he determination of whether a party owes a duty to another depends on a variety of factors, most notably the foreseeability of the harm suffered by the complaining party." Canal Barge Co., Inc., 220 F.3d at 377. The Fifth Circuit has explained that:

> "Duty ... is measured by the scope of the risk that negligent conduct foreseeably entails. To explicate that concept, this circuit noted [...that...] [w]e perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."

Id. "In determining if there is a duty, the Court must consider what human conduct should have appeared likely to come on the scene, and [...] weigh the dangerous consequences likely to flow

from the challenged conduct in the light of these interventions." In re Signal Int'l, LLC, 579 F.3d 478, 492 (5th Cir. 2009) citing Harper, Fowler, V., HARPER, JAMES AND GRAY ON TORTS 765 (3d ed. 2007).

Here, the Court finds that, although the alleged harm to Johnson may have been a foreseeable consequence of not warning him that the vessel could be boarded, the danger posed is tempered greatly by the expectation, and the reality, that those entities charged with operating the rig would intervene and address such a danger. PPI was not charged with security of the rig, as is admitted by Johnson and various other witness in this matter,[11] thus it is illogical to hold that PPI could be liable when consultants that it recruited failed to inform other consultants that it recruited of risks that a third party was charged with preventing.[12] In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010, 808 F. Supp. 2d 943, 963 (E.D. La. 2011) aff'd sub nom. In re DEEPWATER HORIZON, 12-30012, 2014 WL 700065 (5th Cir. Feb. 24, 2014)("Any access to information that [defendants] may have had did not give rise to a duty to intercede in an independent contractor's operations.")

---

[11] Johnson deposed that "I think that – PPI, since they were running the operation for Afren, I think that they could have done a better job on their security. Of course they didn't have control of the – that's the only thing that they didn't have control over, was the security officers that I know of. (Rec. Doc. 355-8, pps. 262-263) Further, Emeka Ochonogor of TSSN testified that Afren Resources, Ltd was responsible for security of the HIGH ISLAND VII. (Rec. Doc. 355-11, p. 8-9).

[12] Further, even if there was a duty, it is difficult to say that Thomas or Rankin's failure to warn Johnson caused a breach in security that allowed the gunmen to board the vessel.

Accordingly, the Court finds that PPI did not have a duty to inform Johnson about the risk that the vessel could be boarded and will grant summary judgment in favor of PPI on this issue.

**C. Unseaworthiness**

PPI argues that it cannot be liable for the alleged unseaworthiness of the vessel because it is not the owner or operator of the HIGH ISLAND VII, and Johnson did not dispute this contention in its opposition to the instant motion.

The proper defendant to an unseaworthiness claim is the "owner or operator of a vessel." Baker, 656 F.2d at 181-82 citing Daniels v. Florida Power & Light Co., 317 F.2d 41, 43 (5th Cir. 1963), cert. denied, 375 U.S. 832 (1963). In addition to an owner or operator, a bareboat or demise charterer may also be liable for unseaworthiness if "the charterer assumes full possession and control of the vessel." Baker, 317 F.3d at 181-82.

Here, PPI claims that it was not in control of the vessel and points to: (1) evidence that Sedco Forex International was the bareboat charterer of the vessel (Rec. Doc. 179-8), (2) deposition testimony that PPI was not the owner of the vessel or its appurtenances (Rec. Doc. 355-8, pps. 28-30), and (3) deposition testimony from Robert Croke that PPI did not have any equipment on the vessel and that Transocean had control over the actual equipment and the vessel itself. (Rec. Doc. 355-5, pps. 19-20) The fact that PPI did not own or exert control over the vessel itself

23

is further corroborated by the fact that, under the terms of the consulting agreement, PPI acted "for the benefit of PSL to retain PPI supply, technical, accounting, legal, marketing, administrative, and logistical support to its wholly owned subsidiary, PPI Technology Services Nigeria Limited." (Rec. Doc. 319-1-, p.1) This evidence clearly demonstrates that PPI did not exert complete control over the vessel itself, and Johnson has cited to no evidence and made no argument to the contrary. Therefore, summary judgment will be granted in favor of PPI on Johnson's claim for unseaworthiness.

Accordingly,

**IT IS ORDERED THAT** Defendant PPI Technology Services, LP's **Motion for Summary Judgment on Employment Status, Lack of Legal Duty, and Lack of Evidence of Breach (Rec. Doc. 355)** is **GRANTED.**

**IT IS FURTHER ORDERED THAT** Plaintiff James Johnson's claims against PPI Technology Services, LP's for negligence under the Jones Act and for unseaworthiness, negligence, and maintenance and cure under general maritime law are hereby **DISMISSED WITH PREJUDICE.**

New Orleans, Louisiana this 3rd day of April, 2014.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE